Dan Stormer, Esq. [S.B. # 101967]
Shaleen Shanbhag, Esq. [S.B. #301047]
HADSELL STORMER & RENICK LLP
128 N. Fair Oaks Avenue
Pasadena, California 91103
Telephone: (626) 585-9600
Facsimile: (626) 577-7079
Emails: dstormer@hadsellstormer.com
          sshanbhag@hadsellstormer.com

Attorneys for Plaintiff
APRIL POWELL-WILLINGHAM

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| APRIL POWELL-WILLINGHAM, | Case No.: |
| Plaintiff, | **COMPLAINT FOR DAMAGES** |
| v. | **1. SEX DISCRIMINATION AND (TITLE VII)** |
| JOINT AID MANAGEMENT USA; JOINT AID MANAGEMENT INTERNATIONAL; PETER PRETORIUS; ANGIE STANKOVIC; PATRICK KAPUKHA; and DOES 1 through 10, inclusive, | **2. SEX HARASSMENT (TITLE VII)** |
| | **3. RACE AND NATIONAL ORIGIN DISCRIMINATION (TITLE VII)** |
| Defendants. | **4. RETALIATION FOR COMPLAINING ABOUT DISCRIMINATION AND HARASSMENT (TITLE VII)** |
| | **5. SEX DISCRIMINATION AND (FEHA)** |
| | **6. SEX HARASSMENT (FEHA)** |
| | **7. RACE AND NATIONAL ORIGIN DISCRIMINATION (FEHA)** |
| | **8. FAILURE TO PREVENT HARASSMENT AND RETALIATION (FEHA)** |
| | **9. RETALIATION FOR COMPLAINING ABOUT DISCRIMINATION AND HARASSMENT (FEHA)** |
| | **10. RETALIATION (CAL. LABOR CODE §1102.5(b) AND (c))** |
| | **11. WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY** |
| | **12. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS** |
| | **DEMAND FOR JURY TRIAL** |

**PARTIES**

1.      Plaintiff April Powell-Willingham brings this action against defendants Joint Aid Management USA ("JAM USA"), Joint Aid Management International ("JAM INT"), Peter Pretorius, Angie Stankovic, Patrick Kapukha and Does 1 through 10 (collectively "Defendants"), for general, compensatory, punitive and statutory damages; prejudgment interest, costs and attorneys' fees; and other appropriate and just relief resulting from Defendants' unlawful and tortious conduct, and as grounds therefore alleges:

**JURISDICTION AND VENUE**

2.      This court has jurisdiction under 28 U.S.C. § 1331 (federal question). Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391 (b) because Plaintiff resides in this District in the County of Los Angeles, CA.  Plaintiff's state law claims for relief are within the pendent and supplemental jurisdiction of the Court, as authorized by 28 U.S.C. § 1367.

**PARTIES**

3.      Plaintiff April Powell-Willingham ("Ms. Powell-Willingham") is a resident of Woodland Hills in Los Angeles County, California.  Plaintiff is a female of fifty-five years of age and is of African American descent.

4.      Defendant JAM USA is a nonprofit corporation, incorporated in the state of Michigan in 2005 as J.A.M. International, and thereafter amended in 2010 to do business under the name of Joint Aid Management USA, with offices at 726 7th Street SE, Washington D.C. 20003.  JAM USA is a wholly-owned and operated subsidiary of JAM INT.  The Articles of Incorporation and Certificate of Amendment are attached hereto as Exhibit 1.

5.      Defendant Joint Aid Management International ("JAM INT"), is an international non-governmental organization ("INGO") doing business in the United States as Joint Aid Management USA ("JAM USA") (hereinafter collectively referred to as "JAM") which is a non-profit corporation conducting business in the United

States, and in the State of California by virtue of its contract with Ms. Powell-Willingham, negotiated and executed in Woodland Hills, Los Angeles County, California, during February and March 2016.  At all relevant times herein, JAM INT acted as an agent of JAM USA.

6.  Defendant Peter Pretorius, on information and belief, at all relevant times herein, was the founder, President and Chief Executive Officer (CEO) of JAM USA, JAM INT, and head of the JAM Executive Committee ("EXCOM") which directs and operates all JAM entities, including JAM USA.  At all relevant times herein, he acted as an agent of JAM USA.  Many of the events which occurred while Ms. Powell-Willingham was employed by JAM USA took place while Pretorius was present in the United States.  At all times, Pretorius is the final decision maker for all of JAM entities, including JAM USA.

7.  Defendant Angie Stankovic, on information and belief, at all relevant times herein, was employed by JAM INT as the Chief Operating Officer ("COO"), the second in command to Pretorius and the head of the JAM Senior Management Team composed of herself, Patrick Kapukha and Christian Campbell.  At all relevant times herein, she acted as an agent of JAM USA.  Many of the events which occurred while Ms. Powell-Willingham was employed by JAM USA took place while Stankovic was present in the United States.  At all times, second only to Pretorius, Stankovic is a final decision maker for all JAM entities, including JAM USA and acts as an agent of JAM USA.

8.  Defendant Patrick Kapukha, on information and belief, at all relevant times herein, was employed by JAM as the Vice President for Programs ("VPP") and was Ms. Powell-Willingham's direct supervisor.  At all relevant times herein, he acted as an agent of JAM USA.

9.  Plaintiff is ignorant of the true names and capacities of defendants sued herein as Does 1 through 10, inclusive, and therefore sues these defendants by such fictitious names and capacities.  Plaintiff will amend this Complaint to allege their true identities when ascertained.  Plaintiff is informed and believes and on that basis alleges,

COMPLAINT FOR DAMAGES              -2-

that each fictitiously named defendant is responsible in some manner for the acts and failures to act herein alleged, and that Plaintiff's injuries as herein alleged were legally caused by the conduct of each such defendant.

10.   Plaintiff is informed and believes and thereupon alleges that, at all times material herein, each of the defendants was the agent or employee of, and/or working in concert with, his/her co-defendants and was acting within the course and scope of such agency, employment and/or concerted activity.  Plaintiff alleges that to the extent certain acts and omissions were perpetrated by certain defendants, the remaining defendant or defendants confirmed and ratified said acts and omissions.

11.   Plaintiff is informed and believes and thereupon alleges, that at all times material herein each defendant was dominated and controlled by his/her co-defendant and each was the alter-ego of the other.

12.   Defendants, and their agents and employees, authorized, condoned and ratified the unlawful conduct of each other.  Consequently, Plaintiff is entitled to recover punitive damages from each Defendant.

13.   Whenever and wherever reference is made in this Complaint to any act or failure to act by a defendant or defendants, such allegations and references shall also be deemed to mean the acts and failures to act of each defendant acting individually, jointly and severally.

## FACTUAL ALLEGATIONS

14.   Ms. Powell-Willingham began her employment with JAM USA as Country Director, Joint Aid Management International South Sudan Country Office ("JAM SS") on March 14, 2016, pursuant to a duly signed and executed contract of employment.  (Exhibit 2).  This contract was formed in Woodland Hills, California on February 29, 2016, when Ms. Powell-Willingham accepted JAM USA's offer of employment, with a start date of March 14, 2016.  In Paragraph 20.1 of the contract, the parties agreed that the employment agreement "shall be governed by, construed, and enforced in accordance with laws of the United States of America."

15.     JAM USA summarily terminated Ms. Powell-Willingham on November 9, 2016, in violation of the laws of the United States of America as set forth herein.  Ms. Powell-Willingham has exhausted all administrative remedies and received right to sue notices from the Equal Employment Opportunity Commission ("EEOC") on June 6, 2017, and from the California Department of Fair Employment and Housing DFEH on April 21, 2016.  The EEOC right to sue letter is attached hereto as Exhibit 3, and the DFEH right to sue letter is attached as Exhibit 4.

16.     Prior to taking up her position, Ms. Powell-Willingham negotiated two rest and recuperation ("R&R") leave rotations up front due to family obligations – first in mid-June 2016, and then for most of October 2016.  She deployed first to Johannesburg, South Africa, to JAM INT offices, on the 21 March, 2016, for an orientation, and from there to Juba, South Sudan (SS), on or about the 25 March, 2016.

17.     Ms. Powell-Willingham was given the standard JAM USA orientation, including the origin and founding story.  She learned that while JAM has remained also a South African based organization, it owns and operates a global network of independently registered Affiliate Offices in the USA, Canada, Switzerland, South Africa, Germany and the United Kingdom.  Additionally, the JAM Affiliate Offices, such as the JAM USA office, focus on marketing and partnership ventures, as well as internal functions, such as hiring employees or independent contractors.  At the time Ms. Powell-Willingham started her employment, JAM worked in five African countries, Angola, South Africa, South Sudan, Mozambique and Rwanda.  Each of these countries has its own JAM country office, such as the South Sudan country office, which Ms. Powell-Willingham was to head up.

18.     During this orientation at JAM USA, she also reviewed and signed basic human resources paperwork, and met with the former JAM Country Director, Mohammed Sharif, Angie Stankovic, the COO, and Joyce Davids, the head of human resources.  Ms. Powell-Willingham was told that her immediate boss, Patrick Kapukha, the VPP, was already in South Sudan and she would meet him upon her arrival in Juba.

She was also told repeatedly that she would be the only expatriate ("expat"), or international, woman on the team, and that that would "be good for the guys" and that they needed to have "a woman's touch." At the time, given her lengthy experience working overseas in conflict zones in male dominated settings, this did not appear to be cause for any particular concern. The JAM Country Office Senior Management Team consisted of Ms. Powell-Willingham as Country Director, and Senior Managers for finance, human resources, operations and programs.

19.    Ms. Powell-Willingham found out during her first meeting with the former JAM County Director, Mohamed Sharif, during her orientation at JAM USA, that the South Sudan Country Office was in crisis due to badly performed World Food Programme projects with unaccounted for losses totaling nearly $1,000,000.00 during 2014 and 2015. She was not made aware of this material information during the hiring process.

20.    During her first meeting with Stankovic, the COO, Stankovic was oddly rude and demeaning toward Ms. Powell-Willingham and stated that she did not know why Kapukha had hired Ms. Powell-Willingham given her constitutional and governance background. After speaking with Ms. Powell-Willingham for a few moments about her background, experience and approach to managing teams and trouble-shooting in conflict zones, she then equally oddly said that she then saw why. Ms. Powell-Willingham was puzzled by these comments, but did not remark on them as she was in the midst of an orientation process, and at that stage was simply taking it all in, as was her normal approach to taking up a new overseas position.

21.    Ms. Powell-Willingham was scheduled to travel to Juba, South Sudan, prior to the weekend, in part because the Juba International Airport was closed over weekends for construction. She arrived in Juba, South Sudan, on or around March 25, 2016, on Good Friday, a holiday and the start of the long Easter weekend in South Sudan. Two of her Senior Management Team members, Finance Manager, Hassan Zubairu, and Operations Manager, Leader Makumator, met her at the Juba International

1  Airport to assist with customs, baggage and transport.  They helped her get settled
2  during the course of the weekend by helping her buy personal supplies, and orienting
3  her to the security situation prevailing at the time and their particular concerns about the
4  safety and security of the international and national members of the Country Office.

5       22.    She met Kapukha, her direct supervisor, later on the day she arrived.
6  Along with her two managers, the four of them went out for welcoming cocktails and
7  dinner at a secure, expatriate compound in Juba, known only to Plaintiff as "the AFEX
8  compound" where Kapukha ordered Zubairu, the Senior Finance Manager, to pay for
9  their drinks and meals.  Ms. Powell-Willingham felt strange about this and uncertain of
10  its propriety, but was uncertain whether Zubairu paid out of his own funds or JAM
11  funds.

12       23.    In addition to Kapukha, another JAM senior manager, Victor Mafu, a
13  senior financial manager in charge of all of JAM's financial operations, was in South
14  Sudan to conduct an internal reconciliation on the 2014 and 2015 World Food
15  Programme projects that had gone badly in terms of unreported and unaccounted for
16  losses totaling nearly $1,000,000.

17       24.    Kapukha, Mafu and Ms. Powell-Willingham, as senior JAM personnel,
18  resided at the TM Lion Hotel ("TM Lion"), diagonally across the street about a block
19  away from the JAM SS offices.  The rest of the expats on the team resided at a guest
20  house around the corner from the JAM offices.  Ms. Powell-Willingham had frequent
21  uncomfortable encounters at the TM Lion during these first few weeks with Kapukha
22  that would set the tone for the rest of her time with JAM.

23       25.    Several of these uncomfortable encounters occurred during meals at the
24  TM Lion restaurant – the ones Kapukha and Ms. Powell-Willingham took without
25  Mafu.  Kapukha insisted that he and Ms. Powell-Willingham meet every morning for
26  breakfast.  Mafu sometimes joined them, and then Kapukha's behavior was more
27  circumspect.  Several times after work, upon arriving back to her room at the TM Lion,
28  Kapukha would call her on the internal hotel phone demanding that she come

downstairs and have a glass of wine with him.  She did so, several times, only to be summarily dismissed by him in anger at her reserve with him and keeping the discussion limited to topics pertaining to work, not her body shape, size, figure, looks or relationship status which he would bring up.

26.     While this was all slightly unusual in her professional experience and very discomfiting, Ms. Powell-Willingham felt that she had no choice but to do as Kapukha commanded.  As a professional she also realized that she needed to continue learning more about the organization and Kapukha's expectations of her in her role as Country Director, given that he was her direct supervisor and would be leaving the country soon to return to JAM in Johannesburg or to another JAM Country Office.

27.     She felt it was particularly important to learn as much as she could from Kapukha in light of the unpleasant and potentially ruinous World Food Programme reconciliation situation that JAM faced.  She knew that Mafu was instructed to stay in South Sudan and to work with the Country Office team to gather and sort through numerous invoices, waybills and the like in order to reach agreement with World Food Programme.  JAM's failure to resolve the World Food Programme reconciliation situation was negatively affecting JAM SS's ability to secure continued funding from humanitarian donors, and potentially even private donors, especially in the U.S., such as the Life Outreach International ("LOI") Ministries, one of JAM's biggest donors. Given the future trajectory of South Sudan as it emerged from conflict and humanitarian emergency status to a more "development" oriented phase, this reputational problem stood to hinder the JAM SS Country Office's ability to remain viable.  In addition, Pretorius and his Senior Management Team were expressing frustration with the high amount of financial loss and exposure to JAM caused by problems in the JAM SS Country Office and were threatening to close it down.

28.     It became clear to Ms. Powell-Willingham during her first few days in Juba that JAM hoped that her presence, as an experienced American international development professional managing large teams and budgets, would assist in reassuring

World Food Programme and other key humanitarian and development donors that the JAM SS Country Office was a trustworthy partner.  These other donors included other United Nations agencies, such as the United Nations Common Humanitarian Fund ("CHF"), United Nations International Children's Fund ("UNICEF"), and as well as United States agencies, for example United States Agency for International Development (USAID), the Office of United States Foreign Disaster Assistance ("OFDA") and the United States Department of Agriculture ("USDA").

29.     During the command breakfast and after work meetings at the TM Lion's restaurant, Ms. Powell-Willingham quickly realized that Kapukha had an additional agenda other than work.  He remarked on her figure, and how young Ms. Powell-Willingham looked, repeatedly commenting on her figure and inquiring as to her relationship status.  He said once to her words to the effect that "she could not have such a figure now if she had not had a good figure when she was younger."  He also said that if had he not seen her "documents," presumably her passport, he would "not believe [her] age."  He would also call her room after working hours and summon her to have drinks with him in the hotel lobby, or to have drinks and/or dinner with him.  Ms. Powell-Willingham tried to not panic even though she felt vulnerable and scared about such comments and behavior as she was alone in a dangerous conflict zone with a male superior employee who was making such demands.

30.     Kapukha also complained angrily within the first 24-48 hours of her arrival in country that Ms. Powell-Willingham was "spending too much time with Hassan and Leader" (2 of her then 5 direct reports through whom Ms. Powell-Willingham was to manage the operation), and that the "other guys" would or did feel "left out."  He implied that Ms. Powell-Willingham favored those two over the others, despite the fact that she had just met the two of them, and not yet even met other members of her team, a fact of which he was well aware.

31.     Zubairu related to her after that holiday weekend that Kapukha had berated him for what Kapukha described as monopolizing Ms. Powell-Willingham during the

weekend, stating that he should "give the other guys a chance."

32.     Toward the end of the first or second week that Ms. Powell-Willingham was in Juba, Kapukha left for Johannesburg or one of the other country offices.  By the time he left Juba, Ms. Powell-Willingham had already experienced Kapukha as sexist and demeaning toward her.  Kapukha was generally authoritarian toward everyone, but Ms. Powell-Willingham experienced an edge particularly directed toward her after she rebuffed his advances.  He treated Ms. Powell-Willingham in a sexist manner and with an animus toward African-Americans.  Ms. Powell-Willingham felt it best to avoid Kapukha and to stay out of his way as much as possible, so was relieved when he left.

33.     Security was an issue that was apparent from the start, starting with the JAM South Sudan Country Office set up.  JAM South Sudan occupied three separate locations in the highly insecure environment of Juba, South Sudan, and in a particularly unsafe part of town, Thom Ping, where INGO personnel were coming under increasing attack, including armed robbery and rape.  Ms. Powell-Willingham did not reside with her team, but was housed separately at the TM Lion Hotel, about one block away from the South Sudan Country Office.  The rest of the international staff were housed in a guest house about four blocks away.  Both she and the expat staff walked to and from their respective residences to work in the morning, at noon for lunch and at the close of business every day.

34.     Ms. Powell-Willingham from the outset identified and was vocal about this arrangement, particularly in light of the prevailing security situation in the country and particularly in Juba concerning security in general and danger to women specifically.  Staff health, safety and well-being generally were and are not priorities for JAM.  Living and working conditions actually put the staff at risk both from a medical or health as well as security standpoint.  Ms. Powell-Willingham learned also that, despite common practice among other international organizations in South Sudan after the outbreak of civil war in December 2013, JAM USA had no contingency plans or evacuation coverage in place to ensure its international staff could get out in the event

COMPLAINT FOR DAMAGES          -9-

1    of an emergency.

2         35.    When approached about security issues, relocation of JAM SS offices and

3    residences to a safer area, and evacuation plans, Kapukha said both that it was Ms.

4    Powell-Willingham's call as Country Director, but also not to "believe what the guys"

5    were telling her.  He basically dismissed her and her team's valid concerns for her and

6    the team's safety.  He accused the other staff of misleading her about security,

7    denigrating her significant experience in active conflict zones such as Afghanistan, Iraq

8    and Somalia, and her professional judgment as well.  Kapukha often stated to her that

9    "as an American" Ms. Powell-Willingham "was not used to how things are in Africa."

10        36.    During this entire period, until about late June 2016, Mafu remained in

11   Juba to conduct the reconciliation exercise.  Mafu constantly forced Ms. Powell-

12   Willingham to hear his gossip about how Angie Stankovic, Christian Campbell and

13   Kapukha all sleep with one another and others, engage in sexual banter, and bring sex

14   toys to the work place.  He focused particularly on telling Ms. Powell-Willingham how

15   Zubairu was playing the field, i.e. even though he is married, he has a Juba girlfriend

16   and intimated that now Ms. Powell-Willingham was in rotation to sleep with him.  He

17   also told her a story about Zubairu sleeping with the HR Director, Joyce Davids.  Ms.

18   Powell-Willingham found these remarks offensive and troubling and outside the realm

19   of professional propriety and indicated this to Mafu.

20        37.    In the midst of this, the security condition continued to deteriorate sharply,

21   intensifying Ms. Powell-Willingham's concern for her and her team's safety.  It was

22   clear from the security reports the team received that Thom Ping in particular was

23   becoming increasingly unsafe for INGOs and their staff, particularly their expatriate

24   staff.  The JAM SS guest house was particularly vulnerable.  Staff members had been

25   attacked numerous times on the way to and from the guest house.  The guest house had

26   been robbed in late April or May late at night while the team was sleeping when robbers

27   came in over the wall and stole a flat screen TV. Ms. Powell-Willingham and

28   Makumator, along with the entire expatriate JAM SS team, continued to raise concerns

about this with Kapukha in order to get his approval to relocate the team to one of the alternate locations they identified but to no avail.  On the night before Ms. Powell-Willingham and members of her Senior Management Team were due to travel to Johannesburg for a Program Meeting in late May 2016, she received a call at about 4:00 a.m. from the guest house housekeeper who was whispering hysterically that the guest house was invaded by five heavily armed and masked men, who held two Senior Management Team members hostage, with guns pointed to the back of their heads execution style.   Ms. Powell-Willingham immediately called the JAM SS security provider's rapid response team to ensure that it was aware that the silent alarm had been activated and to inquire as to when the team might arrive to rescue her staff.  The rapid response team did not respond or show up until long after the incident was over.  She also immediately called Victor Mafu, who came to her suite in the TM Lion to help deal with the crisis and try to contact the other team members to find out who was safe.  She called Kapukha on his mobile phone to alert him that the JAM SS team was in a dangerous crisis situation at that very moment, and that depending on the outcome they may not be able to travel the next day.  He instructed her to keep him informed, but again made light of the situation.  The situation did not resolve until dawn, several hours later.  The armed gunmen, after holding two Senior Management Team members hostage at gunpoint, ransacking the compound and attempting to round up the other staff members hiding in the rooms, left, stealing one of JAM SS vehicles.  It was only after this extremely serious and dangerous attack after a series of such attacks that JAM SS personnel had suffered, that Kapukha agreed to allow Ms. Powell-Willingham to relocate JAM SS offices and operations to a safer area within Juba.  The JAM SS team relocated to the Acacia compound in a safer location within Juba, with much better security.

      38.     In late May 2016, the very next day after the JAM SS guest house had been violently invaded, Ms. Powell-Willingham traveled back to the JAM base with members of her team, including Zubairu and Jameson Gadzirai, the Program Manager,

1   for the annual Program Meeting.  The meeting lasted from May 24 to June 1, 2016.

2   Other country office teams were represented as well (e.g. Angola, Mozambique, and

3   South Africa).  Kapukha, Stankovic, and Campbell, the Finance Controller, participated

4   also, along with Pretorius and various other JAM staff.

5         39.     During the official parts of the Program Meeting, Kapukha was overtly

6   rude, demeaning and discriminatory to Ms. Powell-Willingham and to a young

7   Zimbabwean woman who works for him as a Senior Program Manager, Vimbanai

8   Chakarisa.  Examples of how Kapukha publicly demeaned Ms. Powell-Willingham

9   during the meeting, in contrast to how he treated men in the group, include refusing to

10   allow her to finish her statements when speaking, cutting her off, dismissing her

11   contributions and speaking in a noticeably sharp tone to her in contrast to how he spoke

12   to others.  Chakarisa shared with Ms. Powell-Willingham her complaints about

13   Kapukha's treatment of her and her fear of losing her job if she spoke up in protest.

14         40.     Ms. Powell-Willingham met Campbell, a member of JAM USA's and

15   JAM INT's Senior Management Team, for the first time at this Program Meeting

16   gathering in late May 2016.  Campbell thereafter engaged in intense sexual harassment

17   that would continue throughout the remainder of her employment with JAM USA.

18         41.     In a later conversation on or about May or June 2016, while Ms. Powell-

19   Willingham was at JAM USA in Johannesburg for a Program Meeting, Stankovic

20   confirmed to Ms. Powell-Willingham that Kapukha indeed "had it in for [your] guys,

21   especially Hassan" and that it was "probably over a woman."  Stankovic during that

22   same visit, later, in front of Campbell and her nephew, accused Ms. Powell-Willingham

23   of sleeping with Zubairu and other of her expat male staff, stating that "it must be

24   flattering to have the attention of so many younger guys."  Thereafter, Zubairu was

25   subsequently accused by Stankovic, Kapukha and Mafu not only of an illicit affair with

26   Ms. Powell-Willingham, but also of various financial mistakes in his role as Finance

27   Manager.  He resigned and left JAM USA in or around October 2016.

28         42.     At the end of the Program Meeting, JAM USA took the group on a team

COMPLAINT FOR DAMAGES    -12-

building, weekend retreat to a private game park just outside Johannesburg.  On the Saturday evening, after having been pressured by the group and Campbell, in particular, to stay at the gathering by the fire and keep drinking (because Ms. Powell-Willingham and a number of other women had declined to do so the night before), Ms. Powell-Willingham finally was able to make her way from the lodge where they were gathered to her room.  Campbell scurried to follow her and as Ms. Powell-Willingham said goodnight, he pounced.  It was dark, quiet, and right next to the bank of rooms where the rest of the group was staying. Ms. Powell-Willingham resisted by trying to push him away, but he was much stronger than her.  She did not want a scene or scandal so did not scream.  He grabbed, kissed, groped her and rubbed himself against her.  He then dragged her behind the building where it was even darker and no one could see them from the parking lot separating the lodge and the rooms.  Ms. Powell-Willingham saw Kapukha in the distance walking over at some point and that was the only thing that got Campbell to stop.  Campbell is taller than Ms. Powell-Willingham, and much stronger.  He then proceeded to harass her for the remainder of the time Ms. Powell-Willingham was with JAM USA and sent her many WhatsApp messages and persisted in his advances.  The night, at the end of the Program Meeting that weekend, that Ms. Powell-Willingham was leaving the JAM USA base to fly back to Juba, Campbell insisted on coming to her room/cabin on the grounds, and, even with the door open and the curtains open and the driver waiting, Ms. Powell-Willingham had to fight him off again.  He continued to text Ms. Powell-Willingham after she left the JAM USA base and while she was in California from June 14 through July.  Ms. Powell-Willingham continued to make clear that she was not interested in a relationship with him other than as colleagues. Because she needed to work with him, she made an effort to be collegial, polite and diplomatic.  The next time Ms. Powell-Willingham saw him, at the Strategic Direction meeting in or around August, 2016 Campbell was actively mistreating her and Zubairu (her then Finance Manager who was accused by Kapukha of having an affair with Ms. Powell-Willingham).

43.     Since the Program Meeting in May 2016, Campbell, through his Finance team at HQ, particularly Mafu, attempted to make life miserable for Ms. Powell-Willingham.  In August 2016 or thereabouts, when Ms. Powell-Willingham went to Johannesburg, Mafu and Ms. Powell-Willingham met to discuss various budgetary issues concerning the South Sudan Country Office, and Mafu told her that Stankovic, Campbell and Kapukha were saying that Ms. Powell-Willingham was "sleeping with all those young boys" in Juba. Ms. Powell-Willingham was constantly prodded, warned, accused and retaliated against by Kapukha, Mafu, Campbell and Stankovic because they spread rumors that she was sleeping with Zubairu and or "all those young boys out there" in South Sudan and accused her of such behavior to her face and to others at different times.

44.     During the May 2016 Program Meeting at the JAM base, Stankovic and Campbell, in a meeting in Angie's office, informed her that Kapukha had come back complaining that Hassan had "made moves on" her because, as Stankovic often said to Ms. Powell-Willingham, "Hassan cannot keep his dick in his pants."  Zubairu had joined them at the Program Meeting from his leave back home in Maryland and brought Ms. Powell-Willingham perfume and pens from Costco in the United States.  He also brought many other women perfume and small gifts for many of his male colleagues as well.  Makumator had on a prior occasion also brought back gifts for Ms. Powell-Willingham and other ladies.  Ms. Powell-Willingham took this to be a common practice among her South Sudan Senior Management Team members.  However, Stankovic made a big point of warning Ms. Powell-Willingham that "Hassan does this with everyone."  Stankovic then too brought up the story about Zubairu and Davids sleeping together at a prior team meeting at HQ, as if any of that was relevant to Ms. Powell-Willingham.  Stankovic and Campbell brought this up again at a dinner Ms. Powell-Willingham had with them during this visit.

45.     At this stage, Kapukha and Ms. Powell-Willingham were having real trouble.  He had, for instance, in a teleconference between himself and Ms. Powell-

Willingham, in May 2016, prior to the Program meeting, censured her for being "too emotional" about a serious issue Ms. Powell-Willingham brought up to him.  The issue she reported to him was that the JAM SS Program Manager, a critical position in the organization, was simply not performing, and appeared to be drinking heavily from the late morning onwards every day, according to various reports from colleagues.  He told Ms. Powell-Willingham she was overreacting.  When Ms. Powell-Willingham insisted that her reaction was actually an appropriate one and expressed frustration at Kapukha yet again refusing to listen to her or show her even the barest modicum of collegial respect, he told her that she was "being emotional."

46.     Despite the "don't sleep with Hassan" talk, Stankovic during this period was polite and apparently supportive of Ms. Powell-Willingham and encouraged her to come talk to her if Ms. Powell-Willingham could not reach or "get through" to Kapukha because of his attitude toward women, and particular, Ms. Powell-Willingham.  Kapukha would often simply not answer her e-mails, SMS or phone calls, yet demand Ms. Powell-Willingham and her team meet unexpected deadlines and complete unnecessary tasking with incomplete or incoherent guidance, if any at all.

47.     While Ms. Powell-Willingham was at JAM in May 2016, Stankovic and Ms. Powell-Willingham discussed meeting in June or early July 2016 during her first leave back to the U.S. to attend meetings with USAID, OFDA, and USDA in Washington D.C.  Ms. Powell-Willingham is an American, and the U.S. was at the time the single largest donor to South Sudan, so, the logic of this as part of a fundraising strategy with potential donors was immediately apparent to Ms. Powell-Willingham.  Ms. Powell-Willingham believed in the idea of an African international non-governmental organization ("INGO") providing humanitarian and development assistance to a fellow African nation as a sort of "South-South" exchange of ideas and approaches.  She was heartened by Stankovic's support and concerns about Kapukha's behavior toward her and hoped to make a significant contribution to JAM overall and to improving the humanitarian condition in South Sudan.

48.    Ms. Powell-Willingham learned during this period that she had been ordered to appear in Perth, Australia, for court ordered divorce mediation at the end of July, early August.  Stankovic and Ms. Powell-Willingham were in regular communication through WhatsApp messaging and phone calls while Ms. Powell-Willingham was in Juba until June 14th and during her leave in Los Angeles, California, thereafter.  Stankovic and Ms. Powell-Willingham were in constant communication by e-mail, text messages, WhatsApp and telephone while Ms. Powell-Willingham was in Woodland Hills, Los Angeles County, California, trying to arrange a time to hold meetings in Washington D.C. in early July but given the summer holidays had no luck in scheduling meeting with relevant USG personnel.  During most of this time, Stankovic was in the United States while communicating with Ms. Powell-Willingham.

49.    During this period, including during the time while Stankovic was in the U.S. at JAM USA's Washington D.C. office, and Ms. Powell-Willingham was also in the U.S., in Woodland Hills, Los Angeles County, during the latter part of June and July, 2016, Stankovic had basically taken over supervising Ms. Powell-Willingham, as Kapukha simply was not responding to e-mails, text messages or WhatsApp communications from Ms. Powell-Willingham.  Ms. Powell-Willingham, because of Kapukha's sexist behavior, was having a very hard time performing her job.  Based on Stankovic's comments to her about Kapukha, Ms. Powell-Willingham felt that Stankovic saw that he was being inappropriate towards Ms. Powell-Willingham.  Ms. Powell-Willingham discussed with her the need to make travel arrangements to return to Juba, given that Ms. Powell-Willingham had not done so when Ms. Powell-Willingham left so that Ms. Powell-Willingham could meet Stankovic in Washington D.C. for the meetings with various U.S. Government donors during her leave and possibly go back to Juba from Washington D.C.  Ms. Powell-Willingham suggested she fly back to Juba between July 6 and 15, 2016, depending on the D.C. meetings, as originally planned.  Stankovic vetoed that idea, suggesting instead that Ms. Powell-

Willingham not do that but rather "just manage by remote from LA" and then go to Perth for personal matters, thereafter returning to her duty station in Juba, rather than undertaking so much travel.

50.    This conversation about how to manage Ms. Powell-Willingham's travel and location during July and August took place while Ms. Powell-Willingham was still in Los Angeles, just before and during the July 7, 2016, outbreak of renewed violence in Juba.  Among other conversations Stankovic and Ms. Powell-Willingham had during this time in early July, before, during and after the outbreak of violence on July 7, was one in which Ms. Powell-Willingham was very direct and honest with Stankovic regarding Ms. Powell-Willingham's concerns about Kapukha.  Stankovic stated that she had known this from their earlier conversations in May and from observing Kapukha's behavior toward and interactions with Ms. Powell-Willingham.  She admitted to Ms. Powell-Willingham that she knew Kapukha is sexist and treated women badly in the workplace, but that since she is his boss, he is not that way with her, "but clearly is with other women."  Stankovic repeatedly encouraged Ms. Powell-Willingham to come to her if Ms. Powell-Willingham had further trouble with Kapukha.

51.    During this period in early July, while Ms. Powell-Willingham was in the U.S., managing the JAM SS Country Office by remote, violence broke out again in Juba.  Ms. Powell-Willingham's Operations Manager, Makumator, was in Juba, along with two other expat staff members.  Makumator and Ms. Powell-Willingham were in constant communication during her leave, particularly as the security situation deteriorated in early July.  He and Ms. Powell-Willingham were even talking by phone during the heaviest of the fighting or about July 7, 2016, while Makumator was dodging bullets and heavy artillery coming into the Acacia compound where the JAM SS team was then based.  Both Makumator, as head of security and operations, and Ms. Powell-Willingham agreed that evacuation was in order for the team in Juba, and, when possible and as necessary, from other locations in South Sudan.  Luckily only 3 out of 12 expatriate staff were in Juba at this time given various field deployments and leave.

1  During this decision-making process, Ms. Powell-Willingham consulted Stankovic.

2  Kapukha was, as usual, unresponsive to Ms. Powell-Willingham, even during this

3  extreme crisis and the risk posed to his South Sudan based team.

4       52.    Ms. Powell-Willingham and Makumator made the decision to evacuate the

5  team to Nairobi, where the team was to wait out the violence and assess next steps.  Ms.

6  Powell-Willingham then had to change her travel arrangements to join the team in

7  Nairobi instead of Juba upon her return from leave in the U.S.  Stankovic was informed

8  about and agreed to these arrangements because Kapukha remained uncommunicative.

9  Later, however, when it came time to approving the extra cost of changing her return

10  ticket, Stankovic turned the decision over to Kapukha and inexplicably stopped

11  communicating with Ms. Powell-Willingham, and refused to intervene with the

12  increasing abuse from Kapukha at this point, even though he was Stankovic's direct

13  supervisee.

14       53.    At this point Kapukha doubled down on his abuse of Ms. Powell-

15  Willingham via e-mails and teleconferences on Skype or WhatsApp.  Ms. Powell-

16  Willingham sent him an email outlining what was going on and the need to reroute her,

17  and seeking approval to pay for the cost of the ticket change.  He did not respond to Ms.

18  Powell-Willingham, but instead sent to her an e-mail intended for Stankovic that

19  basically said, "am having another idea about [Ms. Powell-Willingham's] commitment

20  and ability."  Stankovic and Ms. Powell-Willingham talked about this because while

21  Kapukha had been abusive toward Ms. Powell-Willingham, he had not overtly or

22  expressly denigrated her professional ability in such a manner directly.  Stankovic

23  expressed surprise at Kapukha's e-mail when Ms. Powell-Willingham sent it, given

24  Stankovic was pleased with Ms. Powell-Willingham's performance, as evidenced by

25  the fact that she had planned on having Ms. Powell-Willingham join her in Washington

26  D.C. to meet with USG donors.  In response to Ms. Powell-Willingham's complaints

27  about Kapukha at that time, Stankovic stated that a more formal intervention was in

28  order.

COMPLAINT FOR DAMAGES     -18-

54.     Kapukha later sent Ms. Powell-Willingham an email apologizing for the e-mail, and explaining that this was an "email about [her] but not meant for [her]".  They then proceeded to engage in a series of contentious email exchanges around various issues concerning the evacuation, post-evacuation planning, strategic direction and program planning, while Ms. Powell-Willingham was in the U.S., working, but managing by remote as directed to do earlier by Stankovic, first from Los Angeles, then Honolulu (about a 3 week period in July) and Perth while her team was in Nairobi post-evacuation.

55.     During the latter part of July and beginning of August, Ms. Powell-Willingham and her team were preparing for another HQ meeting in Johannesburg, this time on the 2017-2021 Strategic Direction for JAM, which necessarily required that each country office prepare a multi-year plan as well.

56.     The meeting was held at JAM's Johannesburg offices from August 12 – 20, 2016.  Ms. Powell-Willingham attended, along with most of the JAM SS Senior Management Team, including Zubairu, who happened to be passing through on his way back from leave in the US, so attended also.

57.     In or around July or early August, 2016, while still in the U.S., in Los Angeles, Ms. Powell-Willingham again complained verbally, during a WhatsAPP or Skype call, of Kapukha's treatment of her verbally to Davids, head of Human Resources.  Davids proposed that a meeting be held during the Strategic Direction proceedings at JAM in August with Kapukha, Stankovic, Ms. Powell-Willingham and Davids to sort out the issues.  Ms. Powell-Willingham agreed to this modality of resolution, hoping that Kapukha and she would be able to arrive at an agreed way forward, particularly with Stankovic participating.  However, after Ms. Powell-Willingham arrived at the JAM base, Stankovic suddenly declined to participate, despite the serious nature of the complaints Ms. Powell-Willingham had, which Stankovic herself had already validated – that Kapukha treats her – and most women subordinate to him – in a demeaning and discriminatory manner.

COMPLAINT FOR DAMAGES                    -19-

58.    Davids was clearly nervous about "taking Mr. Kapukha on" at all, especially alone, without Stankovic present, as she had said to Ms. Powell-Willingham, because "Mr. Kapukha is very much [Ms. Stankovic's] person."  Davids related to Ms. Powell-Willingham that Stankovic is the current "heir apparent" to the "Pretorius throne" and was the "favored child."  So no meeting was held.  During this conversation, Davids asked Ms. Powell-Willingham if she was aware of other women being mistreated by Kapukha.  While Chakarisa, Kapukha's Senior Program Manager, had confided many times both in person and over text messages and Google Hangouts about Kapukha's treatment of herself to Ms. Powell-Willingham, she had also begged Ms. Powell-Willingham not to say anything to anyone at JAM USA because she feared for her job if Kapukha was made aware of her complaints.  Ms. Powell-Willingham therefore did not disclose Chakarisa's complaints to Davids, despite the fact that Davids guessed who else might be having problems with Kapukha.  Ms. Powell-Willingham merely indicated that it was Davids's job to investigate and deal with these issues.

59.    Kapukha was nominally polite to Ms. Powell-Willingham during the Strategic Direction meeting and the "retreat" held towards the end.  Ms. Powell-Willingham found this unusual and during the week found out from Mafu and Davids that the Peter and Anne Pretorius were quite unhappy with Kapukha for a number of reasons, one among them being his treatment of Ms. Powell-Willingham and other women employees and/or agents of JAM USA. Ms. Powell-Willingham also heard through the grapevine that they were quite unhappy with Kapukha, in part because they may have gotten wind through Davids that Ms. Powell-Willingham was on the verge of taking formal action.  Kapukha was clearly on his best behavior and trying hard not to be as awful as he had been in the past.  Anne Pretorius in particular was very hard on him during the Strategic Direction meeting.  Both Anne and Peter Pretorius praised Ms. Powell-Willingham's presentations during the proceedings.

60.    At the beginning of this August 2016 visit to JAM for the Strategic Direction meetings, Ms. Powell-Willingham had a meeting with Mafu, who was based

back at the JAM base by this time due to the evacuation from Juba.  Mafu made sure to repeat to Ms. Powell-Willingham many times how he was the only one at JAM who "had her back" and that they all were convinced that Ms. Powell-Willingham was "sleeping with not just Hassan now, but all these young boys" on her team back in Juba or Nairobi or wherever they all happened to be.  Ms. Powell-Willingham was shocked, repulsed, humiliated and hurt by this accusation and the knowledge that this rumor was openly discussed among senior JAM Senior Management Team members.

61.     During this Strategic Direction meeting in August 2016, Campbell made it a point one morning to bring a round, fuzzy toy with a lion face and strings attached to it to breakfast, held in the in the conference center dining room prior to the start of the day's meetings.  He came at Ms. Powell-Willingham with this object while she was seated, attempting to eat breakfast, and wiggled the object around in Ms. Powell-Willingham's face repeatedly with his hands, moving them around, several times to his groin, thrusting his hips back and forth in her face.  Ms. Powell-Willingham was confused, dismayed and humiliated by what Campbell was doing.

62.     Evidently Ms. Powell-Willingham's confusion and dismay was quite apparent, because at lunch that day, Stankovic made a point of interrogating Ms. Powell-Willingham, while laughing wildly, saying, "do you know what that was Chris had this morning" and "you know that was a sex toy, right, the thing Chris had this morning?"  Stankovic was insistent that Ms. Powell-Willingham get the "joke."  Stankovic was eager to inform Ms. Powell-Willingham that she had given "them all sex toys one year for Christmas," among "them" being Campbell and Kapukha.  It was a thong or G-string for men with a fuzzy lion face.

63.     Ms. Powell-Willingham had not in fact recognized that the object Campbell had been waving in her face at breakfast, in front of numerous colleagues, was a sex toy and was shocked and humiliated all over again at having been made a spectacle of in front of her colleagues and her team members.  Ms. Powell-Willingham felt nauseous upon learning what it was and felt dismayed that Stankovic, the COO,

took it upon herself to make sure Ms. Powell-Willingham got the "joke."

64.    Ms. Powell-Willingham noted at the time, however, that during this sex toy at breakfast incident, both Peter and Anne Pretorius were in attendance and laughing along with Stankovic and Campbell and enjoying the show at Ms. Powell-Willingham's expense.

65.    Ms. Powell-Willingham repeatedly expressed her dismay about the experience with Kapukha, Campbell, and Stankovic as well.  In various discussions with senior members of her team and others at HQ, such as Davids, Chakarisa, Mafu, and Stankovic, Ms. Powell-Willingham had been very clear regarding how upset she was about the behavior and conduct by JAM personnel, especially senior management.

66.    In this August 2016 Strategic Direction meeting, Ms. Powell-Willingham and her team presented various scenarios for the country office, given the deteriorated political and security situation in South Sudan.  She and her team proposed managing operations by remote from Nairobi until an intervention force was approved by South Sudan, the UN and other international and regional actors, and in fact actually deployed by the UN.  The proposal mapped out how to do this and minimize and limit our expat presence in country, by keeping the number of expats in country to a minimum for rotations of limited periods of time for specific, mission critical purposes only.  They proposed to enhance national staff development to compensate for remote management. National staff development and capacity building is in any event best international practice.  Ms. Powell-Willingham provided continuous security updates and analyses, and scenarios during the Strategic Direction meetings, as well as risk mitigation measures and risk management strategies.

67.    Up until now, the JAM SS team had been threatened with closure of the country office due to the financial irregularities prior to Ms. Powell-Willingham's tenure.  However, Peter Pretorius made clear to Ms. Powell-Willingham that "there is money in South Sudan and [he] wants more of it" – "it" being more business in South Sudan – apparently at any cost, even the lives of his own employees.  Pretorius also

stated that he wanted the team to go back in to Juba full time, with the possible exception of Ms. Powell-Willingham.  Ms. Powell-Willingham complained to Pretorius about the safety issues.

68.    At this stage Ms. Powell-Willingham had clearly expressed her reservations about her and the team fully deploying back to Juba, being very outspoken about the danger of mass rape of South Sudanese and, increasingly, expatriate women. She attempted to explain to JAM senior decision makers including Peter Pretorius, Anne Pretorius and Stankovic that it would be important to condition return on clear indicators that the South Sudanese troops' command and control structure was back in place, and that security overall had improved in both political and criminal respects. Ms. Powell-Willingham and Makumator recommended to JAM that it put some, however minimal and relatively inexpensive, security mitigation measures in place, as advised by Makumator and other experienced security personnel, including JAM SS's security providers, and that the expat team should not fully deploy back into Juba, South Sudan, but rather stick to the rotation out of Nairobi to Juba and other locations, such as Wau, in Northern Bahr Al Ghaazal, which were somewhat safer.

69.    During the Strategic Direction meeting, everyone at JAM had expressed agreement with Ms. Powell-Willingham's and her team's position and recommendations.  Pretorius, Mrs. Pretorius and Stankovic, even Kapukha agreed during the meeting with EXCO that the expat team members should remain based out of Nairobi for the foreseeable future but that Pretorius would communicate his final decision after the meeting, within the following week or so.

70.    Everyone agreed that, after the Terrain Hotel incident in Juba during the July violence, being a North American was highly risky, and that the risk of mass rape was also extremely high given the lack of accountability in South Sudan.  Yet, JAM continued to refuse to put any mitigation measures in place (extra guards, reinforced structures, blast film etc.) claiming there was no budget for this.  Instead, the EXCO responded by requiring Ms. Powell-Willingham to identify several expats to be

terminated from JAM SS to provide budget relief to JAM, declining to even respond to Ms. Powell-Willingham's security requests, merely stating that they would get back to her and her team on the whole issue.

71.     In late August, JAM, rather than responding at all to Ms. Powell-Willingham's and the JAM SS team's proposed Strategic Direction scenario recommendations, Pretorius sent an HQ team into Juba.  This team consisted of Kapukha, Campbell, and Mafu, without consulting or informing Ms. Powell-Willingham or her Senior Management Team.  She and her team learned of this mission only because they were asked to make hotel and flight arrangements for the HQ team.

72.     Ms. Powell-Willingham and her Senior Management Team met with the HQ team on their way in to Juba through Nairobi on the night before their flight to Juba, on or about September 2016.  Ms. Powell-Willingham decided to send Zubairu and his deputy, Tom Wandera, in with the HQ team so that they could finish up some pressing finance audits demanded by donors other than World Food Programme, and to ensure other transactions took place given the very basic and heavily manual accounting and banking systems in place in South Sudan.  However, it was made clear that the HQ team did not trust or believe Ms. Powell-Willingham's assessment of the situation given its potential loss of income.  Kapukha directed her and her team to wait for them to come back to give their assessment and decision about whether to fully deploy back into Juba.  A male Country Director would not have been treated this way by Kapukha and his colleagues from JAM USA.  In fact, rather than directly discuss and problem solve around security risk mitigation measures, Kapukha continually called into question Ms. Powell-Willingham's courage and competence, stating that "if [she] could find her courage, [she] could go back" but stated essentially that "you Americans" don't have such courage.  However, Kapukha also stated at different times that "as an American and a woman" Ms. Powell-Willingham "would not be allowed to go back" because it was too dangerous. Ms. Powell-Willingham could never figure out what JAM's or Kapukha's policy was.

73.     Kapukha and Ms. Powell-Willingham held a meeting in Nairobi on or about September, 2016, after a trip to Juba and before Ms. Powell-Willingham went out on a leave that was pre-approved when she started her employment. The purpose of the leave was to attend her only daughter's wedding in October in New Orleans. Ms. Powell-Willingham also indicated to Kapukha and Davids that she needed to leave Nairobi a few days early, on a Friday, which would not add much extra time to her leave, just the weekend, in order to seek medical treatment in Hamburg, Germany. The health insurance JAM USA provided did not provide coverage for medical treatment in the United States, so Ms. Powell-Willingham knew that her only opportunity to get the care she needed would be in Hamburg, where she has family and ready access to medical care for her condition.

74.     Kapukha stated that that was fine, and to communicate with Davids regarding the correct form to fill out. He also informed Ms. Powell-Willingham that when she returned from leave, JAM EXCO needed to know whether Ms. Powell-Willingham would go back into Juba or not. Ms. Powell-Willingham stated that she understood what Kapukha had stated. At no time did Kapukha state to Ms. Powell-Willingham any outcome should her decision be not to return to Juba. Kapukha also refused to state whether JAM would undertake even the most minimal security precautions to mitigate the risk to expatriate staff.

75.     Ms. Powell-Willingham went on leave on or about September 30, 2016, in order to seek medical treatment in Hamburg (JAM medical insurance covers everywhere but the US), and planned to leave Hamburg by October 7, to return to Los Angeles to help her daughter with last minute planning for the wedding later that month in New Orleans. While Ms. Powell-Willingham was on leave, Ms. Powell-Willingham felt unwell and required further medical treatment prior to returning to Nairobi. The only time she could do that was the week after the wedding, so she explored extending her leave with Kapukha by email from Los Angeles.

76.     However, by this time, the JAM SS Senior Management Team had been

informed that yet another meeting had been called at JAM to present the JAM SS 2017 Budget in advance of yet another meeting at JAM in early December.  It seemed urgent and dire that Ms. Powell-Willingham return, so Ms. Powell-Willingham agreed, stating that Ms. Powell-Willingham would need to follow up on some medical tests in Nairobi afterwards.

77.    While back in Johannesburg at JAM USA HQ, on a Thursday in early November 2016, Kapukha pulled her into his office stating that EXCO wanted her decision. Ms. Powell-Willingham stated that she was not going to fully return to South Sudan in the absence of any shoring up of JAM SS's security posture given the known, actual risks the team faced in South Sudan after the July violence and the Terrain Hotel incident, among other serious incidents in Juba, in particular.  Kapukha tried to bait her by again calling her courage into question - "well, if you could find the courage to go back in…" He had made similar statements to Ms. Powell-Willingham earlier in the course of her employment with JAM USA during discussions on this same topic of security generally, going as far as to comment again, before her October 2016 leave, that Ms. Powell-Willingham is an American and a woman and therefore unused to risk and hardship.  Ms. Powell-Willingham reminded him, as Ms. Powell-Willingham had done many times, that Ms. Powell-Willingham had served in equally, if not more dangerous places, including Afghanistan, Iraq, and Somalia.  She reminded him that she had been in South Sudan on and off for the past 4 or 5 years, so his intimation that she lacked courage was simply not true or fair.

78.    The next day, Friday, 4 November, Kapukha and Davids called her into a meeting to say that EXCO had met and wanted the Country Director in the country, without regard to security.  They said also that if Ms. Powell-Willingham did not go in, they would send someone in immediately.  Kapukha accused her of taking unauthorized leave, despite his full knowledge that he agreed to her leave schedule (mid-June and October of 2016) upon commencement of her employment, and that Stankovic had agreed to and in fact herself suggested to the extended leave/remote management

COMPLAINT FOR DAMAGES          -26-

arrangement in July.  He also said that "well, as a woman and an American, you wouldn't be allowed to go back in anyway…." and yet in the same breath berated her and yelled at her for daring to (again) suggest that some risk management might make it more doable for her to go back in and make it more secure and safe for her team members as well.  He yelled at her that no other INGOs were doing anything of the sort, so why should JAM do anything at all and that there was no money to make even the most minimal improvements Ms. Powell-Willingham and her security and operations manager, Makumator, had proposed for not just her safety, but the entire team's safety, some costing as little as $1,500.00, such as blast film on the windows of the villa the expat Senior Management Team would occupy.  She pointed out past dangers to expatriate women, who face the danger of mass rape by criminals and combatants.  The only and wholly inadequate mitigation measure that Kapukha indicated that he and EXCO would approve was to purchase individual first aid kits for each expat team member.

79.    At this point, Ms. Powell-Willingham felt emotionally depressed, exhausted, humiliated, anxious and deeply unsafe at JAM USA given Kapukha's sexist behavior and Campbell's continued unwelcome sexual advances.  Stankovic had abandoned all pretense of even attempting to rectify the situation.  Stankovic had been and was aware of the problems Ms. Powell-Willingham had experienced with Kapukha yet did nothing to intervene to stop the discriminatory behavior, abuse, harassment and retaliation.

80.    Ms. Powell-Willingham met again with Davids on or around the following Monday, November 7, 2016, during which Davids repeated JAM's demands.  Ms. Powell-Willingham also asked Davids, as the head of human resources, for help in dealing with Kapukha, reminding her of his treatment of Ms. Powell-Willingham, Davids herself and other women at JAM.  At this time, she also requested Davids's assistance in dealing with not only the discriminatory treatment but the sexual harassment and overall hostile work environment prevailing at JAM.

COMPLAINT FOR DAMAGES                    -27-

81.     On November 9, 2016, Ms. Powell-Willingham met one final time with Davids and Kapukha wherein Kapukha stated that Davids had told him of her claims about discrimination and harassment, and then proceeded to terminate her employment with JAM USA.

82.     Ms. Powell-Willingham felt physically and emotionally vulnerable and unsafe remaining on JAM property, fearing even more retaliation while trapped on the JAM compound, so made her own travel arrangements to leave the compound and Johannesburg that day.

83.     In this November 9, 2016, meeting with Kapukha and Davids, Ms. Powell-Willingham again set out her complaints of discrimination and harassment as well as her concerns about security, safety and risk mitigation measures for herself and the South Sudan country team.  Defendants then retaliated against her for complaining about the discrimination and harassment by terminating Ms. Powell-Willingham's employment.

## CAUSES OF ACTION
## FIRST CAUSE OF ACTION
### Sex Discrimination in Violation of Title VII 42 USC §§ 2000e et. seq.
### [Plaintiff against Defendants JAM USA, JAM INT and Does 1-10]

84.     Plaintiff incorporates herein by reference all of the foregoing facts and allegations of this Complaint as though fully set forth herein.

85.     Plaintiff April Powell-Willingham, while an employee of JAM USA and its agent JAM INT, was discriminated against based on her sex, female.  As detailed *supra* at ¶¶ 3-83, immediately upon commencing her employment and throughout her employment was verbally abused, humiliated, and harassed by JAM USA and JAM INT on account of her sex.

86.     Discrimination on the basis of sex is prohibited under Title VII, 42 U.S.C. §§ 2000e et seq.  Ms. Powell-Willingham was ridiculed, insulted and sexually harassed, and after complaining of such was summarily terminated on pretext due to

COMPLAINT FOR DAMAGES          -28-

1   management's refusal to address her complaints.

2       87.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff

3   has suffered and will continue to suffer pain and suffering; anxiety; embarrassment;

4   humiliation; loss of self-esteem; depression; severe mental anguish and emotional

5   distress; loss of earnings and other employment benefits.  Plaintiff is therefore entitled

6   to general and compensatory damages in an amount according to proof at trial.

7       88.    The conduct of Defendants and/or their agents/employees, as described

8   herein, was malicious and oppressive and done with a willful and conscious disregard

9   for Plaintiff's rights entitling Plaintiff to an award of punitive damages from

10  Defendants.

11                        **SECOND CAUSE OF ACTION**

12  **Sex Harassment in Violation of Title VII 42 USC §§ 2000e et. seq.**

13                      **[Plaintiff against all Defendants]**

14      89.    Plaintiff incorporates herein by reference all of the foregoing facts and

15  allegations of this Complaint as though fully set forth herein.

16      90.    Plaintiff April Powell-Willingham, while an employee of JAM USA, was

17  harassed based on her sex, female.  As detailed *supra* at ¶¶ 3-83, immediately upon

18  commencing her employment and throughout her employment was verbally abused,

19  humiliated, and harassed by JAM USA, JAM INT, Peter Pretorius, Angie Stankovic,

20  Patrick Kapukha.

21      91.    Discrimination on the basis of sex is prohibited under Title VII, 42 U.S.C.

22  §§ 2000e et seq.  Federal law prohibiting harassment is derived from Title VII of the

23  Civil Rights Act.  Sex harassment as that endured by Ms. Powell-Willingham is

24  actionable whereas here it was so severe and pervasive that it altered the terms and

25  conditions of Ms. Powell-Willingham's employment and created a hostile and abusive

26  work environment.  Ms. Powell-Willingham was ridiculed, insulted and sexually

27  harassed by senior JAM USA employees and/or agents, JAM INT employees and/or

28  agents, and after complaining of such was summarily terminated on pretext due to

COMPLAINT FOR DAMAGES              -29-

1   management's refusal to address her complaints.

2        92.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff

3   has suffered and will continue to suffer pain and suffering; anxiety; embarrassment;

4   humiliation; loss of self-esteem; depression; severe mental anguish and emotional

5   distress; loss of earnings and other employment benefits.  Plaintiff is therefore entitled

6   to general and compensatory damages in an amount according to proof at trial.

7        93.    The conduct of Defendants and/or their agents/employees, as described

8   herein, was malicious and oppressive and done with a willful and conscious disregard

9   for Plaintiff's rights entitling Plaintiff to an award of punitive damages from

10  Defendants.

## THIRD CAUSE OF ACTION

### Race and National Origin Discrimination in Violation of Title VII 42 USC §§ 2000e et. seq.

### [Plaintiff Against Defendants JAM USA and JAM INT]

15       94.    Plaintiff incorporates herein by reference all of the foregoing facts and

16  allegations of this Complaint as though fully set forth herein.

17       95.    Plaintiff April Powell-Willingham, while an employee of JAM USA and

18  JAM INT, was discriminated against and harassed based on her race and national

19  origin, Black, African-American and from the United States of America.  As detailed

20  *supra* at ¶¶ 3-83, immediately upon commencing her employment and throughout her

21  employment was verbally abused, humiliated, and insulted by JAM USA and JAM INT

22  on account of being African-American and from the United States of America.

23       96.    Discrimination on the basis of race and national origin is prohibited under

24  Title VII, 42 U.S.C. § 2000e-2.  Federal law prohibiting race and national origin

25  discrimination is derived from Title VII of the Civil Rights Act.  Race and national

26  origin discrimination as that endured by Ms. Powell-Willingham is actionable whereas

27  here it was so severe and pervasive that it altered the terms and conditions of Ms.

28  Powell-Willingham's employment and created a hostile and abusive work environment.

Ms. Powell-Willingham was ridiculed, and insulted for being an American and a Black, African-American, and after complaining of such was summarily terminated on pretext due to management's refusal to address her complaints.

97.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and will continue to suffer pain and suffering; anxiety; embarrassment; humiliation; loss of self-esteem; depression; severe mental anguish and emotional distress; loss of earnings and other employment benefits.  Plaintiff is therefore entitled to general and compensatory damages in an amount according to proof at trial.

98.    The conduct of Defendants and/or their agents/employees, as described herein, was malicious and oppressive and done with a willful and conscious disregard for Plaintiff's rights entitling Plaintiff to an award of punitive damages from Defendant.

## FOURTH CAUSE OF ACTION

### Retaliation for Complaining About Discrimination and Harassment in Violation of Title VII 42 USC §§ 2000e et. seq

### [Plaintiff against all Defendants]

99.    Plaintiff incorporates herein by reference all of the foregoing facts and allegations of this Complaint as though fully set forth herein.

100.   As detailed *supra* at ¶¶ 3-83, in violation of 42 U.S.C. §§ 2000e-3(a), Defendants, and each of them and/or their agents/employees, including Pretorius, Stankovic and Kapukha, retaliated against Plaintiff and terminated her employment for complaining of conduct which she reasonably believed constituted unlawful discrimination and harassment on the basis of sex, race and national origin.

101.   Plaintiff has suffered these adverse employment actions because the Defendants have retaliated against her for her public and private opposition to sex, race and national origin discrimination at JAM USA.

102.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and will continue to suffer pain and suffering; anxiety; embarrassment; humiliation; loss of self-esteem; depression; severe mental anguish and emotional

1   distress; loss of earnings and other employment benefits.  Plaintiff is therefore entitled

2   to general and compensatory damages in an amount according to proof at trial.

3        103.   The conduct of Defendants and/or their agents/employees, as described

4   herein, was malicious and oppressive and done with a willful and conscious disregard

5   for Plaintiff's rights entitling Plaintiff to an award of punitive damages from

6   Defendants.

7   **FIFTH CAUSE OF ACTION**

8   **Sex Discrimination in Violation of FEHA Cal. Gov. Code §§ 12940 (a) and (j) and**

9   **California Public Policy**

10   **[Plaintiff against Defendants JAM USA and JAM INT]**

11        104.   Plaintiff incorporates herein by reference all of the foregoing facts and

12   allegations of this Complaint as though fully set forth herein.

13        105.   Plaintiff April Powell-Willingham, while an employee of JAM USA, was

14   discriminated against and harassed based on her sex, female.  As detailed *supra* at ¶¶ 3 -

15   84, immediately upon commencing her employment and throughout her employment

16   was verbally abused, humiliated, and discriminated against by JAM USA and its agent,

17   JAM INT.

18        106.   Discrimination and harassment on the basis of sex is prohibited under Cal.

19   Gov. Code §§ 12940(a) and (j).  Sex harassment as that endured by Ms. Powell-

20   Willingham is actionable where, as here, it was so severe and pervasive that it altered

21   the terms and conditions of Ms. Powell-Willingham's employment and created a hostile

22   and abusive work environment.  Ms. Powell-Willingham was ridiculed, insulted and

23   sexually harassed, and after complaining of such was summarily terminated on pretext

24   due to management's refusal to address her complaints.

25        107.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff

26   has suffered and will continue to suffer pain and suffering; anxiety; embarrassment;

27   humiliation; loss of self-esteem; depression; severe mental anguish and emotional

28   distress; loss of earnings and other employment benefits.  Plaintiff is therefore entitled

1   to general and compensatory damages in an amount according to proof at trial.

2        108.   The conduct of Defendants and/or their agents/employees, as described

3   herein, was malicious and oppressive and done with a willful and conscious disregard

4   for Plaintiff's rights entitling Plaintiff to an award of punitive damages from

5   Defendants.

6   **SIXTH CAUSE OF ACTION**

7   **Sex Harassment in Violation of FEHA Cal. Gov. Code §§ 12940 (a) and (j) and**

8   **California Public Policy**

9   **[Plaintiff against all Defendants]**

10        109.   Plaintiff incorporates herein by reference all of the foregoing facts and

11   allegations of this Complaint as though fully set forth herein.

12        110.   Plaintiff April Powell-Willingham, while an employee of JAM USA, was

13   discriminated against and harassed based on her sex, female.  As detailed *supra* at ¶¶ 3 -

14   84, immediately upon commencing her employment and throughout her employment

15   was verbally abused, humiliated, and harassed by JAM USA and its agents, JAM INT,

16   Peter Pretorius, Angie Stankovic and Patrick Kapukha.

17        111.   Discrimination and harassment on the basis of sex is prohibited under Cal.

18   Gov. Code §§ 12940(a) and (j).  Sex harassment as that endured by Ms. Powell-

19   Willingham is actionable where, as here, it was so severe and pervasive that it altered

20   the terms and conditions of Ms. Powell-Willingham's employment and created a hostile

21   and abusive work environment.  Ms. Powell-Willingham was ridiculed, insulted and

22   sexually harassed, and after complaining of such was summarily terminated on pretext

23   due to management's refusal to address her complaints.

24        112.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff

25   has suffered and will continue to suffer pain and suffering; anxiety; embarrassment;

26   humiliation; loss of self-esteem; depression; severe mental anguish and emotional

27   distress; loss of earnings and other employment benefits.  Plaintiff is therefore entitled

28   to general and compensatory damages in an amount according to proof at trial.

113.   The conduct of Defendants and/or their agents/employees, as described herein, was malicious and oppressive and done with a willful and conscious disregard for Plaintiff's rights entitling Plaintiff to an award of punitive damages from Defendants.

## SEVENTH CAUSE OF ACTION

### National Origin and Race Discrimination in Violation of FEHA Cal. Gov. Code §§ 12940(a) and (j)

### [Plaintiff Against Defendants JAM USA and JAM INT]

114.   Plaintiff incorporates herein by reference all of the foregoing facts and allegations of this Complaint as though fully set forth herein.

115.   Plaintiff April Powell-Willingham, while an employee of JAM USA, was discriminated against and harassed based on her race and national origin, African-American.  As detailed *supra* at ¶¶ 3-84, immediately upon commencing her employment and throughout her employment was verbally abused, humiliated, and discriminated against by JAM USA, and its agents JAM INT, on account of being a Black, African-American and from the United States of America.

116.   Discrimination on the basis of race and national origin is prohibited under FEHA.  Race and national origin discrimination as that endured by Ms. Powell-Willingham is actionable whereas here it was so severe and pervasive that it altered the terms and conditions of Ms. Powell-Willingham's employment and created a hostile and abusive work environment.  Ms. Powell-Willingham was ridiculed, insulted and harassed for being an American and an African-American, and after complaining of such was summarily terminated on pretext due to management's refusal to address her complaints.

117.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and will continue to suffer pain and suffering; anxiety; embarrassment; humiliation; loss of self-esteem; depression; severe mental anguish and emotional distress; loss of earnings and other employment benefits.  Plaintiff is therefore entitled

1  to general and compensatory damages in an amount according to proof at trial.

2        118.   The conduct of Defendants and/or their agents/employees, as described

3  herein, was malicious and oppressive and done with a willful and conscious disregard

4  for Plaintiff's rights entitling Plaintiff to an award of punitive damages from

5  Defendants.

6                        **EIGHTH CAUSE OF ACTION**

7  **Failure to Prevent Harassment and Retaliation in Violation of FEHA, Cal. Gov.**

8                        **Code § 12940 (k)**

9              **[Plaintiff Against Defendants JAM USA and JAM INT]**

10       119.   Plaintiff incorporates herein by reference all of the foregoing facts and

11  allegations of this Complaint as though fully set forth herein.

12       120.   As detailed herein at ¶¶ 3-83, Plaintiff was subjected to harassment,

13  discrimination, and retaliation in the course of her employment.

14       121.   Defendants failed to take all reasonable steps to prevent harassment,

15  discrimination, and retaliation by inter alia: (1) failing to ensure that JAM USA

16  employees are reasonably aware of and appropriately implement reasonable

17  accommodation protocol for employees who report sexual discrimination and

18  harassment; (2) failing to act and failing to compel JAM USA staff and/or its agents to

19  act in a timely and responsive manner when Ms. Powell-Willingham gave notice to

20  Defendants with respect to Kapukha's discrimination and harassment, as well as that of

21  Campbell; (3) failing to provide reasonable accommodation in a lawful manner; (4)

22  failing to develop and implement policies to provide accommodations and prohibit

23  discrimination and harassment against women; (5) failing to prevent harassment of Ms.

24  Powell-Willingham for exercising her legal right to request and receive appropriate

25  accommodations; (6) continuing to assign her discriminator and harasser to be her

26  direct supervisor; and (7) launching an investigation into Ms. Powell-Willingham's

27  leave because she reported sex discrimination and harassment and race and national

28  origin discrimination and harassment.

─────────────────────────
COMPLAINT FOR DAMAGES              -35-

122.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and will continue to suffer pain and suffering; anxiety; embarrassment; humiliation; loss of self-esteem; depression; severe mental anguish and emotional distress; loss of earnings and other employment benefits.  Plaintiff is therefore entitled to general and compensatory damages in an amount according to proof at trial.

123.   The conduct of Defendants and/or their agents/employees, as described herein, was malicious and oppressive and done with a willful and conscious disregard for Plaintiff's rights entitling Plaintiff to an award of punitive damages from Defendants.

## NINTH CAUSE OF ACTION

**Retaliation for Complaining About Discrimination and Harassment in Violation of FEHA Cal. Gov. Code §§ 12940(h) and (i)**

**[Plaintiff against all Defendants]**

124.   Plaintiff incorporates herein by reference all of the foregoing facts and allegations of this Complaint as though fully set forth herein.

125.   As detailed herein at ¶¶ 3-83, Plaintiff was subjected to harassment, discrimination, and retaliation in the course of her employment.

126.   Defendants failed to take all reasonable steps to prevent harassment, discrimination, and retaliation by inter alia: (1) failing to ensure that JAM USA employees and agents are reasonably aware of and appropriately implement reasonable accommodation protocol for employees who report sexual discrimination and harassment; (2) failing to act and failing to compel JAM USA staff and/or its agents to act in a timely and responsive manner when Ms. Powell-Willingham gave notice to Defendants with respect to Kapukha's discrimination and harassment, as well as that of Campbell; (3) failing to provide reasonable accommodation in a lawful manner; (4) failing to develop and implement policies to provide accommodations and prohibit discrimination and harassment against women; (5) failing to prevent harassment of Ms. Powell-Willingham for exercising her legal right to request and receive appropriate

accommodations; (6) continuing to assign her discriminator and harasser to be her direct supervisor; and (7) launching an investigation into Ms. Powell-Willingham's leave because she reported sex discrimination and harassment and race and national origin discrimination and harassment.

127. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and will continue to suffer pain and suffering; anxiety; embarrassment; humiliation; loss of self-esteem; depression; severe mental anguish and emotional distress; loss of earnings and other employment benefits.  Plaintiff is therefore entitled to general and compensatory damages in an amount according to proof at trial.

128. The conduct of Defendants and/or their agents/employees, as described herein, was malicious and oppressive and done with a willful and conscious disregard for Plaintiff's rights entitling Plaintiff to an award of punitive damages from Defendants.

## TENTH CAUSE OF ACTION'

## Retaliation for Whistleblowing and Refusal to Participate in Illegal Activity in Violation of Cal. Labor Code §§ 1102.5(b) and (c)

### [Plaintiff Against Defendants JAM USA and JAM INT]

129. Plaintiff incorporates herein by reference all of the foregoing facts and allegations of this Complaint as though fully set forth herein.

130. As detailed *supra* at ¶¶ 3-83, Ms. Powell-Willingham, while she was working as JAM USA's South Sudan Country Director, realized that JAM's conduct in discriminating against her and harassing her on account of her sex and race constituted unlawful activity under the California Constitution, the Labor Code, the Corporations Code, the Government Code, all state and federal statutes and regulations prohibiting sex and race discrimination and harassment, and all state statutes prohibiting retaliation in the workplace, including specifically, Title VII, 42 U.S.C. §§ 2000e et seq., and FEHA, Cal. Gov. Code § 12940 et seq.

131. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff

COMPLAINT FOR DAMAGES                      -37-

1  has suffered and will continue to suffer pain and suffering; anxiety; embarrassment;

2  humiliation; loss of self-esteem; depression; severe mental anguish and emotional

3  distress; loss of earnings and other employment benefits.  Plaintiff is therefore entitled

4  to general and compensatory damages in an amount according to proof at trial.

5       132.  The conduct of Defendants and/or their agents/employees, as described

6  herein, was malicious and oppressive and done with a willful and conscious disregard

7  for Plaintiff's rights entitling Plaintiff to an award of punitive damages from

8  Defendants.

9  **ELEVENTH CAUSE OF ACTION**

10  **Wrongful Termination in Violation of Public Policy**

11  **[Plaintiff Against Defendants JAM USA and JAM INT]**

12       133.  Plaintiff incorporates herein by reference all of the foregoing facts and

13  allegations of this Complaint as though fully set forth herein.

14       134.  As detailed *supra* at ¶¶ 3-83, Plaintiff protested illegal conduct which

15  violated the public policies of this State as expressed in, *inter alia,* the California

16  Constitution, the Labor Code, the Corporations Code, the Government Code, all state

17  and federal statutes and regulations prohibiting sex and race discrimination and

18  harassment, and all state statutes prohibiting retaliation in the workplace.

19       135.  Defendants terminated Plaintiff's employment because, among other

20  things, she reported unethical and illegal conduct by JAM employees or agents.

21       136.  The conduct of Defendants in terminating Plaintiff was contrary to the

22  interests of the state and public policy, as embodied in the following laws, statutes and

23  regulations, among others: California Constitution Article I § 8; all federal and state

24  statutes and regulations prohibiting retaliation in the workplace. These include, *inter*

25  *alia*, 42 U.S.C. §§ 2000e et seq. and Cal. Government Code §§ 12940 et seq.

26       137.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiff

27  has suffered and will continue to suffer pain and suffering; anxiety; embarrassment;

28  humiliation; loss of self-esteem; depression; severe mental anguish and emotional

distress; loss of earnings and other employment benefits.  Plaintiff is therefore entitled to general and compensatory damages in an amount according to proof at trial.

138.   The conduct of Defendants and/or their agents/employees, as described herein, was malicious and oppressive and done with a willful and conscious disregard for Plaintiff's rights entitling Plaintiff to an award of punitive damages from Defendants.

## TWELFTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress
### [Against all Defendants]

139.   Plaintiff incorporates herein by reference all of the foregoing facts and allegations of this Complaint as though fully set forth herein.

140.   As detailed *supra* at ¶¶ 3-83, South Sudan is an active conflict zone and has bene since renewed civil war in December 2013.  Despite the Peace Agreement signed in January 2015, by the time Ms. Powell-Willingham took up her position as JAM's Country Director for South Sudan, it was clear that the situation was even more dangerous that at any other time prior, due to poor governance, lack of accountability, a failing national economy and increasingly lawlessness and violence.  Extreme violence against women was a central feature of the conflict since 2013, including mass rape of women and girls to the point that many victims died or were severely injured as a result of injuries caused by rape. During the July 2016 conflict, international women became a clear target, as shown by an incident at the Terrain Hotel compound in Juba where an elite armed forces unit numbering over 70 South Sudanese soldiers, shot their way into the compound, gunned down a South Sudanese journalist, and several North American women were raped continuously for several hours by members of this elite guard unit of the South Sudanese armed forces. This incident, along with numerous other indicators of an extremely dangerous situation was widely reported and considered to be a watershed moment in the ongoing conflict, with severe ramifications for the international development and humanitarian community.

141.   When discussing security and safety concerns, Stankovic would dismiss Ms. Powell-Willingham's concerns for her and her team's safety.  In fact, Stankovic often made jokes about how she blithely used to wonder when she served in dangerous field conditions if any given day was the "day she would be raped!"

142.   Kapukha, rather than take Ms. Powell-Willingham's safety and security concerns seriously, also would often joke about "oh, yes, if they rape you, they will call more to come join in and enjoy" and other inappropriate comments.  He would then remark on Ms. Powell-Willingham's lack of courage to face such risks, among other equally dangerous ones, without even some modest precautions and mitigation measures, such as extra armed guards at the Acacia Compound, bars on windows to impede access to the JAM villa, blast film on windows.  Instead, he questioned her courage, dedication and professionalism, even in the face of wide spread continued evacuation status among many INGOs, including ones based in North America and clear advise from UN security monitors for INGOs to provide as much security, including armored vehicles, if possible, for staff to make transport safer.

143.   JAM refused to take any steps to provide even a modicum of additional security in the wake of new, clear and present dangers and risks facing international development and humanitarian workers, despite numerous pleas and proposals, both before the July 2016 outbreak of violence when JAM USA international personnel in South Sudan suffered numerous attacks and after, when the risk level was and remained at its highest level.

144.   Ms Powell-Willingham was humiliated, frightened, perplexed and horrified by Defendants blatant disregard and open ridicule of her concerns for her safety and that of her team.

145.   As outlined in detail above, the conduct of Defendants was extreme and outrageous.  This includes, but is not limited to, Defendants' egregious discrimination and harassment, refusal to protect or accommodate Ms. Powell-Willingham from her abusers and harassers, refusal to provide any security enhancements or accommodations

for Ms. Powell-Willingham as a North American woman and therefore a specific target for violence, particularly gender based violence in South Sudan by combatants and other non-state actors in the country, and retaliatory termination of Ms. Powell-Willingham.  Defendants knew that their conduct would result, and in fact did result, in Plaintiff's severe emotional distress, and said conduct was perpetrated by Defendants with the intent to inflict, or with reckless disregard of the probability of inflicting humiliation, mental anguish, and severe emotional distress upon Plaintiff.  Such conduct did, in fact, result and continues to result in severe emotional distress caused to Plaintiff.

146.   As a result of the Defendants' discriminatory, harassing, and retaliatory actions, Ms. Powell-Willingham has suffered and will continue to suffer physical injuries, including but not limited to, fatigue, depression, loss of sleep, hair loss, nausea, anxiety, stress, headaches and a general decline in health.  She has sustained prolonged pain and suffering, anxiety, stress, embarrassment, humiliation, loss of self-esteem, depression, and extreme and severe mental anguish and emotional distress.  Plaintiff has suffered and continues to suffer loss of earnings and loss of promotional opportunities.

147.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and will continue to suffer pain and suffering; anxiety; embarrassment; humiliation; loss of self-esteem; depression; severe mental anguish and emotional distress; loss of earnings and other employment benefits.  Plaintiff is therefore entitled to general and compensatory damages in an amount according to proof at trial.

148.   The conduct of Defendants and/or their agents/employees, as described herein, was malicious and oppressive and done with a willful and conscious disregard for Plaintiff's rights entitling Plaintiff to an award of punitive damages from Defendants.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

1.     For compensatory damages, including lost past and future wages,

---

COMPLAINT FOR DAMAGES            -41-

employee benefits, medical bills, mental and emotional distress, and other special and general damages according to proof but in excess of the jurisdictional threshold of this court;

    2.    For an award of interest, including prejudgment interest, at the legal rate;

    3.    For punitive damages in an amount to be proven at trial on all causes of action for which such damages are recoverable;

    4.    For any other statutory penalties;

    5.    For such equitable relief as may be appropriate, including injunctive relief;

    6.    For reasonable attorney's fees pursuant to Government Code § 12965(b), California Code of Civil Procedure § 1021.5, 42 U.S.C § 1988(b) and all other applicable statutes;

    7.    For costs of suit incurred herein; and

    8.    For such other and further relief as this court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Dated: September 1, 2017    Respectfully Submitted,

HADSELL STORMER & RENICK LLP

By:  /s/ - Dan Stormer
    Dan Stormer
    Shaleen Shanbhag
    Attorneys for Plaintiff
    APRIL POWELL-WILLINGHAM

COMPLAINT FOR DAMAGES    -42-